IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | CIVIL ACTION NO.  **05 1216** |
| Plaintiff, | ) ) | |
| v. | ) ) | CONSENT DECREE |
| SCHOLASTIC INC., GROLIER INCORPORATED, and SCHOLASTIC AT HOME, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

WHEREAS, Plaintiff, the United States of America, has commenced this action by filing the Complaint herein; Defendants have waived service of the Summons and Complaint; the parties have been represented by the attorneys whose names appear hereafter; and the parties have agreed to the settlement of this action upon the following terms and conditions, without adjudication of any issue of fact or law and without Defendants admitting liability for any of the matters alleged in the Complaint;

NOW, THEREFORE, upon stipulation of Plaintiff and Defendants, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. This Court has jurisdiction of the subject matter and of the parties, and venue in this district is proper as to all parties.

2. The Complaint states a claim upon which relief may be granted against the Defendants under Sections 5(a), 5(m)(1)(A) and (B), 13(b), 16(a) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A) and (B), 53(b), 56(a) and 57b.

3. Entry of this order is in the public interest.

4. The parties hereto stipulate and agree to this Consent Decree, without trial or final adjudication of any issue of fact or law, to settle and resolve all matters in dispute arising from the allegations in the Complaint. Although the Defendants agree to enter into this Order, Defendants deny all of the allegations set forth in the Complaint other than the jurisdictional facts set forth in the Complaint.

## DEFINITIONS

5. "Announcement" has the meaning set forth in Section 425.1(c)(6) of the Prenotification Negative Option Rule, which is: "any material sent by a seller using a Negative Option Plan in which the Selection is identified and offered to Subscribers."

6. "Book Club" means the direct-to-home book clubs operated by Defendants that offer books to consumers on a Continuity Program basis.

7. "Continuity Program" means any plan, arrangement, or system pursuant to which a consumer receives periodic shipments of products or the provision of services without prior notification by the seller before each shipment or service period, regardless of any trial or approval period allowing the consumer to return or be reimbursed for the product or service.

8. "Contract-complete Subscriber" means any Subscriber who has purchased the minimum quantity of merchandise required by the terms of membership in a Book Club or Prenotification Negative Option Plan.

9. "Form" has the meaning set forth in Section 425.1(c)(7) of the Prenotification

Negative Option Rule, which is: "any form which the Subscriber returns to the seller to instruct

the seller not to send the Selection."

10. "Free-to-pay Conversion" means, in an offer or agreement to sell or provide any

goods or services, a provision under which a customer receives a product or service for free for

an initial period and will incur an obligation to pay for the product or service if he or she does not

take affirmative action to cancel before the end of that period.

11. "Negative Option Feature" means, in an offer or agreement to sell or provide any

goods or services, a provision under which the customer's silence or failure to take an affirmative

action to reject goods or services or to cancel the agreement is interpreted by the seller as

acceptance of the offer. The term includes such a provision in offers or agreements involving

Free-to-pay Conversions, automatic renewals, Continuity Programs, and Prenotification Negative

Option Plans covered by the Commission's Rule entitled the "Use of Prenotification Negative

Option Plans," 16 C.F.R. Part 425 (2003) ("Prenotification Negative Option Rule").

12. "Prenotification Negative Option Plan" has the meaning set forth in Section

425.1(c)(1) of the FTC's Trade Regulation Rule entitled "Use of Prenotification Negative Option

Plans" ("Prenotification Negative Option Rule"), 16 C.F.R. Part 425, which is: "a contractual

plan or arrangement under which a seller periodically sends to Subscribers an Announcement

which identifies merchandise (other than annual supplements to previously acquired

merchandise) it proposes to send to Subscribers to such plan, and the Subscribers thereafter

receive and are billed for the merchandise identified in each such Announcement, unless by a

date or within a time specified by the seller with respect to each such Announcement the

Subscribers, in conformity with the provisions of such plan, instruct the seller not to send the identified merchandise."

13. "Selection" has the meaning set forth in Section 425.1(c)(5) of the Prenotification Negative Option Rule, which is: "the merchandise identified by a seller under any Negative Option Plan as the merchandise which the Subscriber will receive and be billed for, unless by the date, or within the period specified by the seller, the Subscriber instructs the seller not to send such merchandise."

14. "Subscriber" means any person who has agreed to receive the benefits of, and assume the obligations entailed in, membership in any Book Club and whose membership in such Book Club has been approved and accepted by the seller.

<u>JUDGMENT FOR CIVIL PENALTY</u>

15. Judgment is hereby entered against Defendants Scholastic Inc., Grolier Incorporated, and Scholastic at Home, Inc. ("Defendants"), jointly and severally, in the amount of $710,000 as a civil penalty, pursuant to Section 5(m)(1)(A) and (B) of the FTC Act, 15 U.S.C. § 45(m)(1)(A) and (B). Defendants must pay the civil penalty within five (5) calendar days of the date of entry of this Order by electronic fund transfer in accordance with instructions provided by the Office of Consumer Litigation, Civil Division, U.S. Department of Justice, Washington, D.C. 20530, for appropriate disposition. In the event of any default in any payment, which default continues for ten days beyond the due date of payment, the entire unpaid payment, together with interest, as computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of payment, will immediately become due and payable directly to Plaintiff.

<u>INJUNCTION</u>

**Prohibited Business Activities in Connection with Negative Option Features**

16.    Defendants, their successors and assigns, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any one or more of them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby enjoined from:

A.    Making any representation, in any manner, expressly or by implication, in connection with the offering to consumers of any offer with a Negative Option Feature, unless, at the time of making such representation, all material terms and conditions of the offer with a Negative Option Feature are clearly and conspicuously disclosed, including:

   i.    if true, that a Subscriber's purchase of supplementary books and other merchandise offered on a Prenotification Negative Option Plan basis does not count toward the minimum purchase requirements of Defendants' Book Clubs; and

   ii.    if true, that cancellation of a Subscriber's enrollment in a Book Club does not cancel future Prenotification Negative Option Plan shipments.

   iii.    if true, that consumers who accept an offer with a Negative Option Feature may receive subsequent offers or additional products or services that require consumers to contact the Defendants to avoid receiving additional products or services and incurring any financial obligation for such additional products or services;

iv.    if true, that the Defendants automatically enroll consumers in a Prenotification Negative Option Plan or a Continuity Program, if consumers make purchases or accept products or services or products or services for a free trial period;

v.    if true, that consumers who accept an offer with a Negative Option Feature are responsible for returning the products that the Defendants offer, at their cost, or that the Defendants will pay for the cost to return such products; and

vi.    before a customer pays for products or services, at least one reasonable means consumers may effectively use to prevent the shipment of additional products, the provision of additional services, or any financial obligation for additional products or services.

B.    Misrepresenting any material term or condition of any offer with a Negative Option Feature.

C.    Selling or distributing or causing to be sold or distributed products or services by means of a Negative Option Feature without first obtaining the consent of consumers to participate in a program or plan with a Negative Option Feature before any shipment of products or provision of services is made. Prior to obtaining consumers' consent, Defendants must disclose clearly and conspicuously in all promotional materials and solicitations, including, but not limited to, direct mail solicitations or inbound and outbound telemarketing calls,

all material terms and conditions of the offer with a Negative Option Feature, including, but not limited to:

i. the fact that periodic shipments of products or the periodic provision or the continuation of services will occur without further action by consumers;

ii. if true, the fact that Subscribers will be enrolled in a Prenotification Negative Option Plan or other plan or program with a Negative Option Feature;

iii. a description of each good or the type of good to be included in each shipment or a description of the services that will be performed or continued;

iv. the approximate interval between each shipment or service period or the number of shipments or service periods per year;

v. the cost or range of costs for each shipment or service period, including whether consumers must pay for shipping and handling;

vi. a description of the billing procedure to be employed for each shipment or period of service;

vii. the minimum number of purchases or minimum service period required by the Defendants, if any;

viii. if the Defendants have a policy of not making refunds or accepting returns, a statement that this is the Defendants' policy or if Defendants make representations about refunds, cancellations, exchanges or repurchasing

policies a statement of all material terms and conditions of a guarantee,

refund or return policy; and

ix.     a description of the terms, conditions, and procedures under which

consumers may cancel further shipments or discontinue a service.

**Business Activities Prohibited Pursuant to the Unordered Merchandise Statute and Previous Commission Determinations**

17. Defendants, their successors and assigns, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of this Consent Decree by personal service or otherwise, in connection with the advertising, promotion, offer for sale or sale of any product or service, are hereby enjoined from violating, directly or through any corporation, subsidiary, division or other device, any provision of the Unordered Merchandise Statute, 39 U.S.C. § 3009(a), or as it may hereafter be amended. A copy of this Rule and a synopsis of previous Commission determinations are attached hereto as "Attachment C" and incorporated herein as if fully set forth verbatim.

18. Defendants, their successors and assigns, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of this Consent Decree by personal service or otherwise, in connection with the advertising, promotion, offer for sale or sale of any product or service, are hereby enjoined, directly or through any corporation, subsidiary, division or other device, from:

A.     Sending any merchandise without the prior expressed request or consent of the

recipient unless such merchandise is clearly and conspicuously marked as a free

sample and has attached to it a clear and conspicuous statement that the recipient

may treat the merchandise as a gift and may retain, use, discard or dispose of it in any manner without any obligation whatsoever to the sender.

B.   Sending any communication, including bills, invoices, reminders, letters, notices or dunning communications, that in any manner seeks to obtain payment for any merchandise shipped without the prior expressed request or consent of the recipient.

**Business Activities Prohibited Pursuant to
The Prenotification Negative Option Rule**

19. Defendants, their successors and assigns, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any one or more of them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby enjoined from ever violating, directly or through any corporation, subsidiary, division or other device, any provision of the Prenotification Negative Option Rule or as the Rule may hereafter be amended, including, but not limited to, by failing to disclose clearly and conspicuously in any advertisement containing or accompanying any device or material that a prospective Subscriber utilizes to request acceptance or enrollment in a Prenotification Negative Option Plan, all material terms of membership in Defendants' Prenotification Negative Option Plan, as required by Section 425.1(a)(1) of the Prenotification Negative Option Rule. Such material terms include, but are not limited to:

A.   That aspect of the plan under which the Subscriber must notify the seller, in the manner provided for by the seller, if the Subscriber does not wish to purchase the Selection;

Page 9 of 18

B.   Any obligation assumed by the Subscriber to purchase a minimum quantity of merchandise;

C.   The right of a Contract-complete Subscriber to cancel his membership at any time;

D.   Whether billing charges will include an amount for postage and handling;

E.   A disclosure indicating that the Subscriber will be provided with at least ten (10) days in which to mail any Form, contained in or accompanying an Announcement identifying the Selection, to the seller;

F.   A disclosure that the seller will credit the return of any Selections sent to a Subscriber, and guarantee to the Postal Service or the Subscriber postage to return such Selections to the seller when the Announcement and Form are not received by the Subscriber in time to afford him at least ten (10) days in which to mail his Form to the seller; and

G.   The frequency with which the Announcements and Forms will be sent to the Subscriber and the maximum number of Announcements and Forms which will be sent to him during a 12-month period.

A copy of this Rule is attached hereto as "Attachment A" and incorporated herein as if fully set forth verbatim.

**Business Activities Prohibited Pursuant to
The Telemarketing Sales Rule**

20.  Defendants, their successors and assigns, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any one or more

of them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby enjoined from ever violating, directly or through any corporation, subsidiary, division or other device, any provision of the Federal Trade Commission's Rule entitled "Telemarketing Sales Rule," 16 C.F.R. Part 310, or as it may hereafter be amended, including, but not limited to, failing to disclose truthfully, in a clear and conspicuous manner, before a customer pays for goods or services offered, all material terms and conditions of an offer for goods or services that includes a Negative Option Feature, including, but not limited to, (i) how consumers must act to avoid periodic supplemental plan shipments and the obligation to pay for or return them, and, (ii) if true, that the cancellation of a consumer's enrollment in a base book club does not cancel future supplemental plan shipments, as required by Section 310.3(a)(1)(vii). A copy of this Rule is attached hereto as "Attachment B" and incorporated herein as if fully set forth verbatim.

### Consumer Notification and Cessation of Collection Efforts

21. Defendants, their successors and assigns, must cease all collection efforts for all Continuity Program shipments that were shipped from January 1, 2001 through December 31, 2003, to Subscribers who had already purchased four shipments from Defendants' Book Clubs and Prenotification Negative Option Plans, but were refused cancellation of their enrollment by Defendants.

22. Defendants, their successors and assigns, must cease all collection efforts for all supplemental Prenotification Negative Option Plan shipments that were shipped, from January 1, 2001 through December 31, 2003, to Contract-complete Subscribers who had already requested cancellation of their Book Club accounts.

23. Defendants, their successors and assigns, must send a notice to all current members

of any of Defendants' Book Clubs or Prenotification Negative Option Plans disclosing, in a clear and conspicuous manner, all material terms and conditions of the program or plan, including the consumer's right to cancel at any time and instructions on how to cancel. For members of Defendants' Prenotification Negative Option Plans, this notice must be included with the first Announcement Defendants send to plan members following the date of entry of this Consent Decree. For members of Defendants' Book Clubs, this notice must be sent within sixty (60) days from the date of service of this order, and may be included with the earliest practical product shipment.

### Record Keeping

24. For a period of three (3) years from the date of entry of this Consent Decree, Defendants and their agents, employees, officers, corporations, successors, and assigns, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and are engaged in the marketing or sale of Defendants' books or products through the use of Book Clubs, Prenotification Negative Option Plans, or other Continuity Programs, are hereby restrained and enjoined from failing to create and retain the following records:

A.    Accounting records that reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;

B.    Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the

person commenced work; and the date and reason for the person's termination, if applicable;

C.  Customer files containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, to the extent such information is obtained in the ordinary course of business;

D.  Written complaint letters and complaints sent via electronic mail (whether received directly, indirectly or through any third party) regarding the terms of or enrollment in any Book Club, Prenotification Negative Option Plan, or Continuity Program, and any responses to those complaints; and all records of complaints received over the telephone to the extent such information is obtained in the ordinary course of business; *provided* that if a response is in the form of a standard form letter, Defendants must retain a single copy of the form letter and must create and maintain information sufficient to identify the customer, the plan or program about which the complaint is made, which standard form letter was sent (including which version if the standard form letter has been revised), the date the response was sent, and the manner in which it was sent (*e.g.*, email, First Class Mail, or private or commercial courier);

E.  Refund requests (whether received directly, indirectly or through any third party) regarding the terms of or enrollment in any Prenotification Negative Option Plan, or Continuity Program, and any responses to those requests; *provided* that if a response is in the form of a standard form letter, Defendants must retain a single

copy of the form letter and must create and maintain information sufficient to identify the customer, the plan or program pursuant to which the request is made, which standard form letter was sent (including which version if the standard form letter has been revised), the date the response was sent, and the manner in which it was sent (*e.g.*, email, First Class Mail, or private or commercial courier); and

F.    Copies of all sales scripts, training materials, advertisements, or other marketing materials.

**Distribution of Order; Notice to FTC; Continuing Jurisdiction**

25. Defendants, their successors and assigns, within thirty (30) days of the entry of this Consent Decree, must provide:

i.    A copy of this Consent Decree, the Prenotification Negative Option Rule, the Telemarketing Sales Rule, the Unordered Merchandise Statute, and the Synopsis of previous Commission determinations to each of their officers and to each of their managers responsible for conduct related to the subject matter of this Consent Decree; and

ii.   A Summary, to be agreed upon by counsel for Defendants and the Commission, setting forth how to comply with the Consent Decree, the Prenotification Negative Option Rule, the Telemarketing Sales Rule, the Unordered Merchandise Statute, and the Synopsis of previous Commission determinations, on all employees, agents, and representatives who are responsible for conduct related to the subject matter of this Consent Decree (including, but not limited to, telemarketers, customer service representatives, persons responsible for drafting promotional

materials, and persons not identified as managers who supervise any of those

listed above in this subparagraph).

Defendants, their successors and assigns, further must secure from each person a signed, or

similarly authenticated, acknowledgment of receipt of a copy of the materials required to be

provided under this Paragraph, and must within ten (10) days of complying with this Paragraph,

provide an affidavit to the Associate Director, Division of Enforcement, Bureau of Consumer

Protection, 600 Pennsylvania Ave., N.W., Washington, D.C. 20580, setting forth the fact and

manner of their compliance, including the name and title of each person to whom a copy of the

Consent Decree and other materials have been provided.

26. Defendants, their successors and assigns, shall notify the Associate Director,

Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600

Pennsylvania Ave., N.W., Washington, D.C. 20580, at least thirty (30) days prior to any change

in Defendants' business including, but not limited to, merger, incorporation, dissolution,

assignment, sale which results in the emergence of a successor corporation, the creation or

dissolution of a subsidiary or parent, or any other change which may affect Defendants'

obligations under this Consent Decree. *Provided, however,* that with respect to any proposed

change in the corporation about which the Defendants learn less than 30 days prior to the date

such action is to take place, the Defendants shall notify the Commission's Associate Director for

Enforcement as soon as practicable after obtaining such knowledge.

27. Defendants are hereby required, in accordance with 31 U.S.C. § 7701, to furnish to

the Federal Trade Commission their taxpayer identifying numbers (employer identification

numbers), which shall be used for purposes of collecting and reporting on any delinquent amount arising out of Defendants' relationship with the government.

28.  This Court shall retain jurisdiction of this matter for the purposes of enabling any of the parties to this Consent Decree to apply to the Court at any time for such further orders or directives as may be necessary or appropriate for the interpretation or modification of this Consent Decree, for the enforcement of compliance therewith, or for the punishment of violations thereof.

The parties, by their respective counsel, hereby consent to the terms and conditions of the Consent Decree as set forth above and consent to the entry thereof.  Defendants waive any rights that may arise under the Equal Access to Justice Act, 28 U.S.C. § 2412.

DATED:                              FOR THE UNITED STATES OF AMERICA:

                                    PETER D. KEISLER
                                    Assistant Attorney General
                                    Civil Division
                                    U.S. Department of Justice

                                    KENNETH L. WAINSTEIN
                                    United States Attorney
                                    District of Columbia


                                    By LAURIE WEINSTEIN, D.C. BAR 389511
                                    Assistant United States Attorney
                                    555 4th St., NW
                                    Washington, D.C.  20001
                                    (202)

EUGENE M. THIROLF
Director
Office of Consumer Litigation


*Elizabeth Stein*

ELIZABETH STEIN
Attorney
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


FOR THE FEDERAL TRADE COMMISSION:


*Elaine D. Kolish*

ELAINE D. KOLISH
Associate Director for Enforcement
Bureau of Consumer Protection
Federal Trade Commission


*James Reilly Dolan*

JAMES REILLY DOLAN
EDWIN RODRIGUEZ
Assistant Director for Enforcement
Bureau of Consumer Protection
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3292


//

//

//

FOR THE DEFENDANTS

SCHOLASTIC INC.
GROLIER INCORPORATED
SCHOLASTIC AT HOME, INC.


By: *Mary Ahlrastor*


*Robert B. Bell*
ROBERT B. BELL
DAVID MEDINE
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M St., NW
Washington, DC 20037
(202) 663-6533



JUDGMENT IS THEREFORE ENTERED in favor of Plaintiff and against Defendants, pursuant to all the terms and conditions recited above.

Dated: _____, 2005.



_____

United States District Judge

merce, as "commerce" is defined in the Federal Trade Commission Act, it is an unfair or deceptive act or practice, for a seller in connection with the use of any negative option plan to fail to comply with the following requirements:

(1) Promotional material shall clearly and conspicuously disclose the material terms of the plan, including:

(i) That aspect of the plan under which the subscriber must notify the seller, in the manner provided for by the seller, if he does not wish to purchase the selection;

(ii) Any obligation assumed by the subscriber to purchase a minimum quantity of merchandise;

(iii) The right of a contract-complete subscriber to cancel his membership at any time;

(iv) Whether billing charges will include an amount for postage and handling;

(v) A disclosure indicating that the subscriber will be provided with at least ten (10) days in which to mail any form, contained in or accompanying an announcement identifying the selection, to the seller;

(vi) A disclosure that the seller will credit the return of any selections sent to a subscriber, and guarantee to the Postal Service or the subscriber postage to return such selections to the seller when the announcement and form are not received by the subscriber in time to afford him at least ten (10) days in which to mail his form to the seller;

(vii) The frequency with which the announcements and forms will be sent to the subscriber and the maximum number of announcements and forms which will be sent to him during a 12-month period.

(2) Prior to sending any selection, the seller shall mail to its subscribers, within the time specified by paragraph (a)(3) of this section:

(i) An announcement identifying the selection;

(ii) A form, contained in or accompanying the announcement, clearly and conspicuously disclosing that the subscriber will receive the selection identified in the announcement unless he instructs the seller that he does not

## PART 425—USE OF PRENOTIFICATION NEGATIVE OPTION PLANS

### § 425.1  The rule.

(a) In connection with the sale, offering for sale, or distribution of goods and merchandise in or affecting com-

**Federal Trade Commission**    §425.1

want the selection, designating a procedure by which the form may be used for the purpose of enabling the subscriber so to instruct the seller, and specifying either the return date or the mailing date.

(3) The seller shall mail the announcement and form either at least twenty (20) days prior to the return date or at least fifteen (15) days prior to the mailing date, or provide a mailing date at least ten (10) days after receipt by the subscriber, provided, however, that whichever system the seller chooses for mailing the announcement and form, such system must provide the subscriber with at least ten (10) days in which to mail his form.

(b) In connection with the sale or distribution of goods and merchandise in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, it shall constitute an unfair or deceptive act or practice for a seller in connection with the use of any negative option plan to:

(1) Refuse to credit, for the full invoiced amount thereof, the return of any selection sent to a subscriber, and to guarantee to the Postal Service or the subscriber postage adequate to return such selection to the seller, when:

(i) The selection is sent to a subscriber whose form indicating that he does not want to receive the selection was received by the seller by the return date or was mailed by the subscriber by the mailing date;

(ii) Such form is received by the seller after the return date, but has been mailed by the subscriber and postmarked at least 3 days prior to the return date;

(iii) Prior to the date of shipment of such selection, the seller has received from a contract-complete subscriber, a written notice of cancellation of membership adequately identifying the subscriber; however, this provision is applicable only to the first selection sent to a canceling contract-complete subscriber after the seller has received written notice of cancellation. After the first selection shipment, all selection shipments thereafter are deemed to be unordered merchandise pursuant to section 3009 of the Postal Reorganization Act of 1970, as adopted by the

Federal Trade Commission in its public notice, dated September 11, 1970;

(iv) The announcement and form are not received by the subscriber in time to afford him at least ten (10) days in which to mail his form.

(2) Fail to notify a subscriber known by the seller to be within any of the circumstances set forth in paragraphs (b)(1)(i) through (iv) of this section, that if the subscriber elects, the subscriber may return the selection with return postage guaranteed and receive a credit to his account.

(3) Refuse to ship within 4 weeks after receipt of an order merchandise due subscribers as introductory and bonus merchandise, unless the seller is unable to deliver the merchandise originally offered due to unanticipated circumstances beyond the seller's control and promptly makes a reasonably equivalent alternative offer. However, where the subscriber refuses to accept alternatively offered introductory merchandise, but instead insists upon termination of his membership due to the seller's failure to provide the subscriber with his originally requested introductory merchandise, or any portion thereof, the seller must comply with the subscriber's request for cancellation of membership, provided the subscriber returns to the seller any introductory merchandise which already may have been sent him.

(4) Fail to terminate promptly the membership of a properly identified contract-complete subscriber upon his written request.

(5) Ship, without the express consent of the subscriber, substituted merchandise for that ordered by the subscriber.

(c) For the purposes of this part:

(1) *Negative option plan* refers to a contractual plan or arrangement under which a seller periodically sends to subscribers an announcement which identifies merchandise (other than annual supplements to previously acquired merchandise) it proposes to send to subscribers to such plan, and the subscribers thereafter receive and are billed for such merchandise identified in each such announcement, unless by a date or within a time specified by the seller with respect to each such announcement the subscribers, in conformity with the provisions of such

423

plan, instruct the seller not to send the identified merchandise.

(2) *Subscriber* means any person who has agreed to receive the benefits of, and assume the obligations entailed in, membership in any negative option plan and whose membership in such negative option plan has been approved and accepted by the seller.

(3) *Contract-complete subscriber* refers to a subscriber who has purchased the minimum quantity of merchandise required by the terms of membership in a negative option plan.

(4) *Promotional material* refers to an advertisement containing or accompanying any device or material which a prospective subscriber sends to the seller to request acceptance or enrollment in a negative option plan.

(5) *Selection* refers to the merchandise identified by a seller under any negative option plan as the merchandise which the subscriber will receive and be billed for, unless by the date, or within the period specified by the seller, the subscriber instructs the seller not to send such merchandise.

(6) *Announcement* refers to any material sent by a seller using a negative option plan in which the selection is identified and offered to subscribers.

(7) *Form* refers to any form which the subscriber returns to the seller to instruct the seller not to send the selection.

(8) *Return date* refers to a date specified by a seller using a negative option plan as the date by which a form must be received by the seller to prevent shipment of the selection.

(9) *Mailing date* refers to the time specified by a seller using a negative option plan as the time by or within which a form must be mailed by a subscriber to prevent shipment of the selection.

(38 Stat. 717, as amended; 15 U.S.C. 41–58)

[38 FR 4896; Feb. 22, 1973; 38 FR 6991, Mar. 15, 1973, as amended at 63 FR 44562, Aug. 20, 1998]

## PART 429—RULE CONCERNING COOLING-OFF PERIOD FOR SALES MADE AT HOMES OR AT CERTAIN OTHER LOCATIONS

Sec.
429.0  Definitions.

429.1  The Rule.
429.2  Effect on State laws and municipal ordinances.
429.3  Exemptions.

AUTHORITY: Sections 1–23, FTC Act, 15 U.S.C. 41–58.

§ 429.0  Definitions.

For the purposes of this part the following definitions shall apply:

(a) *Door-to-Door Sale*—A sale, lease, or rental of consumer goods or services with a purchase price of $25 or more, whether under single or multiple contracts, in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller (e.g., sales at the buyer's residence or at facilities rented on a temporary or short-term basis, such as hotel or motel rooms, convention centers, fairgrounds and restaurants, or sales at the buyer's workplace or in dormitory lounges). The term *door-to-door sale* does not include a transaction:

(1) Made pursuant to prior negotiations in the course of a visit by the buyer to a retail business establishment having a fixed permanent location where the goods are exhibited or the services are offered for sale on a continuing basis; or

(2) In which the consumer is accorded the right of rescission by the provisions of the Consumer Credit Protection Act (15 U.S.C. 1635) or regulations issued pursuant thereto; or

(3) In which the buyer has initiated the contact and the goods or services are needed to meet a bona fide immediate personal emergency of the buyer, and the buyer furnishes the seller with a separate dated and signed personal statement in the buyer's handwriting describing the situation requiring immediate remedy and expressly acknowledging and waiving the right to cancel the sale within 3 business days; or

(4) Conducted and consummated entirely by mail or telephone; and without any other contact between the buyer and the seller or its representative prior to delivery of the goods or performance of the services; or

ATTACHMENT B

**Federal Trade Commission**                                         **§ 310.1**

## PART 310—TELEMARKETING SALES RULE

Sec.
310.1  Scope of regulations in this part.
310.2  Definitions.
310.3  Deceptive telemarketing acts or practices.
310.4  Abusive telemarketing acts or practices.
310.5  Recordkeeping requirements.
310.6  Exemptions.
310.7  Actions by states and private persons.
310.8  Fee for access to the National Do Not Call Registry.
310.9  Severability.

AUTHORITY: 15 U.S.C. 6101–6108.

SOURCE: 68 FR 4669, Jan. 29, 2003, unless otherwise noted.

**§ 310.1  Scope of regulations in this part.**

This part implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101–6108, as amended.

## § 310.2  Definitions.

(a) *Acquirer* means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

(b) *Attorney General* means the chief legal officer of a state.

(c) *Billing information* means any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(d) *Caller identification service* means a service that allows a telephone subscriber to have the telephone number, and, where available, name of the calling party transmitted contemporaneously with the telephone call, and displayed on a device in or connected to the subscriber's telephone.

(e) *Cardholder* means a person to whom a credit card is issued or who is authorized to use a credit card on behalf of or in addition to the person to whom the credit card is issued.

(f) *Charitable contribution* means any donation or gift of money or any other thing of value.

(g) *Commission* means the Federal Trade Commission.

(h) *Credit* means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(i) *Credit card* means any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

(j) *Credit card sales draft* means any record or evidence of a credit card transaction.

(k) *Credit card system* means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

(l) *Customer* means any person who is or may be required to pay for goods or services offered through telemarketing.

(m) *Donor* means any person solicited to make a charitable contribution.

(n) *Established business relationship* means a relationship between a seller and a consumer based on:

(1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or

(2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

(o) *Free-to-pay conversion* means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period.

(p) *Investment opportunity* means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

(q) *Material* means likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution.

(r) *Merchant* means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(s) *Merchant agreement* means a written contract between a merchant and an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(t) *Negative option feature* means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

**Federal Trade Commission**                                          **§ 310.3**

(u) *Outbound telephone call* means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

(v) *Person* means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

(w) *Preacquired account information* means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.

(x) *Prize* means anything offered, or purportedly offered, and given, or purportedly given, to a person by chance. For purposes of this definition, chance exists if a person is guaranteed to receive an item and, at the time of the offer or purported offer, the telemarketer does not identify the specific item that the person will receive.

(y) *Prize promotion* means:

(1) A sweepstakes or other game of chance; or

(2) An oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize.

(z) *Seller* means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

(aa) *State* means any state of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, and any territory or possession of the United States.

(bb) *Telemarketer* means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(cc) *Telemarketing* means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

(dd) *Upselling* means soliciting the purchase of goods or services following an initial transaction during a single telephone call. The upsell is a separate telemarketing transaction, not a continuation of the initial transaction. An "external upsell" is a solicitation made by or on behalf of a seller different from the seller in the initial transaction, regardless of whether the initial transaction and the subsequent solicitation are made by the same telemarketer. An "internal upsell" is a solicitation made by or on behalf of the same seller as in the initial transaction, regardless of whether the initial transaction and subsequent solicitation are made by the same telemarketer.

**§ 310.3   Deceptive telemarketing acts or practices.**

(a) *Prohibited deceptive telemarketing acts or practices.* It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Before a customer pays[1] for goods or services offered, failing to disclose

---

[1] When a seller or telemarketer uses, or directs a customer to use, a courier to transport payment, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before sending a courier to pick up payment or authorization for payment, or
*Continued*

§310.3                                            16 CFR Ch. I (1–1–05 Edition)

truthfully, in a clear and conspicuous manner, the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer;[2]

(ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

(iii) If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or, if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy;

(iv) In any prize promotion, the odds of being able to receive the prize, and, if the odds are not calculable in advance, the factors used in calculating the odds; that no purchase or payment is required to win a prize or to participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate;

(v) All material costs or conditions to receive or redeem a prize that is the subject of the prize promotion;

(vi) In the sale of any goods or services represented to protect, insure, or otherwise limit a customer's liability in the event of unauthorized use of the customer's credit card, the limits on a cardholder's liability for unauthorized use of a credit card pursuant to 15 U.S.C. 1643; and

(vii) If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s).

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

(ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer;

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

(v) Any material aspect of a prize promotion including, but not limited to, the odds of being able to receive a prize, the nature or value of a prize, or that a purchase or payment is required to win a prize or to participate in a prize promotion;

(vi) Any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability;

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity;

(viii) That any customer needs offered goods or services to provide protections a customer already has pursuant to 15 U.S.C. 1643; or

(ix) Any material aspect of a negative option feature including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s).

---

directing a customer to have a courier pick up payment or authorization for payment.

[2] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR 226, compliance with the disclosure requirements under the Truth in Lending Act and Regulation Z shall constitute compliance with §310.3(a)(1)(i) of this Rule.

(3) Causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act and Regulation Z,[3] or a debit card subject to the protections of the Electronic Fund Transfer Act and Regulation E.[4] Such authorization shall be deemed verifiable if any of the following means is employed:

(i) Express written authorization by the customer or donor, which includes the customer's or donor's signature;[5]

(ii) Express oral authorization which is audio-recorded and made available upon request to the customer or donor, and the customer's or donor's bank or other billing entity, and which evidences clearly both the customer's or donor's authorization of payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction and the customer's or donor's receipt of all of the following information:

(A) The number of debits, charges, or payments (if more than one);

(B) The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

(C) The amount(s) of the debit(s), charge(s), or payment(s);

(D) The customer's or donor's name;

(E) The customer's or donor's billing information, identified with sufficient specificity such that the customer or donor understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

(F) A telephone number for customer or donor inquiry that is answered during normal business hours; and

(G) The date of the customer's or donor's oral authorization; or

(iii) Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the customer or donor via first class mail prior to the submission for payment of the customer's or donor's billing information, and that includes all of the information contained in §§ 310.3(a)(3)(ii)(A)-(G) and a clear and conspicuous statement of the procedures by which the customer or donor can obtain a refund from the seller or telemarketer or charitable organization in the event the confirmation is inaccurate; *provided*, however, that this means of authorization shall not be deemed verifiable in instances in which goods or services are offered in a transaction involving a free-to-pay conversion and preacquired account information.

(4) Making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.

(b) *Assisting and facilitating.* It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

(c) *Credit card laundering.* Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this Rule for:

(1) A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;

(2) Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into

---

[3] Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR part 226.

[4] Electronic Fund Transfer Act, 15 U.S.C. 1693 *et seq.*, and Regulation E, 12 CFR part 205.

[5] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

(3) Any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

(d) *Prohibited deceptive acts or practices in the solicitation of charitable contributions.* It is a fraudulent charitable solicitation, a deceptive telemarketing act or practice, and a violation of this Rule for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

(1) The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;

(2) That any charitable contribution is tax deductible in whole or in part;

(3) The purpose for which any charitable contribution will be used;

(4) The percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program;

(5) Any material aspect of a prize promotion including, but not limited to: the odds of being able to receive a prize; the nature or value of a prize; or that a charitable contribution is required to win a prize or to participate in a prize promotion; or

(6) A charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

§ 310.4  **Abusive telemarketing acts or practices.**

(a) *Abusive conduct generally.* It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Threats, intimidation, or the use of profane or obscene language;

(2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a

person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose;

(3) Requesting or receiving payment of any fee or consideration from a person for goods or services represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous telemarketing transaction, until seven (7) business days after such money or other item is delivered to that person. This provision shall not apply to goods or services provided to a person by a licensed attorney;

(4) Requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person;

(5) Disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing; *provided,* however, that this paragraph shall not apply to the disclosure or receipt of a customer's or donor's billing information to process a payment for goods or services or a charitable contribution pursuant to a transaction;

(6) Causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor. In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the

374

**Federal Trade Commission**                                            **§310.4**

goods or services or charitable contribution and to be charged using the identified account. In any telemarketing transaction involving preacquired account information, the requirements in paragraphs (a)(6)(i) through (ii) of this section must be met to evidence express informed consent.

(i) In any telemarketing transaction involving preacquired account information and a free-to-pay conversion feature, the seller or telemarketer must:

(A) obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged;

(B) obtain from the customer his or her express agreement to be charged for the goods or services and to be charged using the account number pursuant to paragraph (a)(6)(i)(A) of this section; and,

(C) make and maintain an audio recording of the entire telemarketing transaction.

(ii) In any other telemarketing transaction involving preacquired account information not described in paragraph (a)(6)(i) of this section, the seller or telemarketer must:

(A) at a minimum, identify the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; and

(B) obtain from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the account number identified pursuant to paragraph (a)(6)(ii)(A) of this section; or

(7) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; *provided* that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours.

(b) *Pattern of calls.* (1) It is an abusive telemarketing act or practice and a

violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

(i) Causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number;

(ii) Denying or interfering in any way, directly or indirectly, with a person's right to be placed on any registry of names and/or telephone numbers of persons who do not wish to receive outbound telephone calls established to comply with §310.4(b)(1)(iii);

(iii) Initiating any outbound telephone call to a person when:

(A) that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) that person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller

(*i*) has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature[6] of that person; or

(*ii*) has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call. An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer

---

[6] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

(2) It is an abusive telemarketing act or practice and a violation of this Rule for any person to sell, rent, lease, purchase, or use any list established to comply with §310.4(b)(1)(iii)(A), or maintained by the Commission pursuant to §310.4(b)(1)(iii)(B), for any purpose except compliance with the provisions of this Rule or otherwise to prevent telephone calls to telephone numbers on such lists.

(3) A seller or telemarketer will not be liable for violating §310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:

(i) It has established and implemented written procedures to comply with §310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to §310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with §310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to §310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;

(v) The seller or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to §310.4(b)(3)(i); and

(vi) Any subsequent call otherwise violating §310.4(b)(1)(ii) or (iii) is the result of error.

(4) A seller or telemarketer will not be liable for violating 310.4(b)(1)(iv) if:

(i) The seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured per day per calling campaign;

(ii) the seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call;

(iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed[7]; and

(iv) the seller or telemarketer, in accordance with §310.5(b)-(d), retains records establishing compliance with §310.4(b)(4)(i)-(iii).

(c) *Calling time restrictions.* Without the prior consent of a person, it is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in outbound telephone calls to a person's residence at any time other than between 8:00 a.m. and 9:00 p.m. local time at the called person's location.

(d) *Required oral disclosures in the sale of goods or services.* It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the seller;

(2) That the purpose of the call is to sell goods or services;

(3) The nature of the goods or services; and

(4) That no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered and that any purchase or payment will not increase the person's chances of winning. This disclosure must be made before or in conjunction with the description of the prize to the person called. If requested by that person, the telemarketer must disclose the no-purchase/no-payment

---

[7] This provision does not affect any seller's or telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

entry method for the prize promotion; *provided*, however, that, in any internal upsell for the sale of goods or services, the seller or telemarketer must provide the disclosures listed in this section only to the extent that the information in the upsell differs from the disclosures provided in the initial telemarketing transaction.

(e) *Required oral disclosures in charitable solicitations.* It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer, in an outbound telephone call to induce a charitable contribution, to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the charitable organization on behalf of which the request is being made; and

(2) That the purpose of the call is to solicit a charitable contribution.

[68 FR 4669, Jan. 29, 2003, as amended at 69 FR 16373, Mar. 31, 2004]

§310.5  Recordkeeping requirements.

(a) Any seller or telemarketer shall keep, for a period of 24 months from the date the record is produced, the following records relating to its telemarketing activities:

(1) All substantially different advertising, brochures, telemarketing scripts, and promotional materials;

(2) The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(3) The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services; [8]

(4) The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees

---

[8] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR 226, compliance with the recordkeeping requirements under the Truth in Lending Act, and Regulation Z, shall constitute compliance with §310.5(a)(3) of this Rule.

directly involved in telephone sales or solicitations; *provided*, however, that if the seller or telemarketer permits fictitious names to be used by employees, each fictitious name must be traceable to only one specific employee; and

(5) All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under this Rule.

(b) A seller or telemarketer may keep the records required by §310.5(a) in any form, and in the same manner, format, or place as they keep such records in the ordinary course of business. Failure to keep all records required by §310.5(a) shall be a violation of this Rule.

(c) The seller and the telemarketer calling on behalf of the seller may, by written agreement, allocate responsibility between themselves for the recordkeeping required by this Section. When a seller and telemarketer have entered into such an agreement, the terms of that agreement shall govern, and the seller or telemarketer, as the case may be, need not keep records that duplicate those of the other. If the agreement is unclear as to who must maintain any required record(s), or if no such agreement exists, the seller shall be responsible for complying with §§310.5(a)(1)-(3) and (5); the telemarketer shall be responsible for complying with §310.5(a)(4).

(d) In the event of any dissolution or termination of the seller's or telemarketer's business, the principal of that seller or telemarketer shall maintain all records as required under this Section. In the event of any sale, assignment, or other change in ownership of the seller's or telemarketer's business, the successor business shall maintain all records required under this Section.

§310.6  Exemptions.

(a) Solicitations to induce charitable contributions via outbound telephone calls are not covered by §310.4(b)(1)(iii)(B) of this Rule.

(b) The following acts or practices are exempt from this Rule:

(1) The sale of pay-per-call services subject to the Commission's Rule entitled "Trade Regulation Rule Pursuant

§ 310.7                                              16 CFR Ch. I (1–1–05 Edition)

to the Telephone Disclosure and Dispute Resolution Act of 1992," 16 CFR Part 308, *provided,* however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(2) The sale of franchises subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," ("Franchise Rule") 16 CFR Part 436, *provided,* however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(3) Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization, *provided,* however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(4) Telephone calls initiated by a customer or donor that are not the result of any solicitation by a seller, charitable organization, or telemarketer, *provided,* however, that this exemption does not apply to any instances of upselling included in such telephone calls;

(5) Telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, *provided,* however, that this exemption does not apply to calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, business opportunities other than business arrangements covered by the Franchise Rule, or advertisements involving goods or services described in §§ 310.3(a)(1)(vi) or 310.4(a)(2)–(4); or to any instances of upselling included in such telephone calls;

(6) Telephone calls initiated by a customer or donor in response to a direct mail solicitation, including solicitations via the U.S. Postal Service, facsimile transmission, electronic mail, and other similar methods of delivery in which a solicitation is directed to specific address(es) or person(s), that clearly, conspicuously, and truthfully discloses all material information listed in § 310.3(a)(1) of this Rule, for any goods or services offered in the direct mail solicitation, and that contains no material misrepresentation regarding any item contained in § 310.3(d) of this Rule for any requested charitable contribution; *provided,* however, that this exemption does not apply to calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, business opportunities other than business arrangements covered by the Franchise Rule, or goods or services described in §§ 310.3(a)(1)(vi) or 310.4(a)(2)–(4); or to any instances of upselling included in such telephone calls; and

(7) Telephone calls between a telemarketer and any business, except calls to induce the retail sale of nondurable office or cleaning supplies; *provided,* however, that § 310.4(b)(1)(iii)(B) and § 310.5 of this Rule shall not apply to sellers or telemarketers of nondurable office or cleaning supplies.

§ 310.7  Actions by states and private persons.

(a) Any attorney general or other officer of a state authorized by the state to bring an action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, and any private person who brings an action under that Act, shall serve written notice of its action on the Commission, if feasible, prior to its initiating an action under this Rule. The notice shall be sent to the Office of the Director, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580, and shall include a copy of the state's or private person's complaint and any other pleadings to be filed with the court. If prior notice is not feasible, the state or private person shall serve the Commission with the required notice immediately upon instituting its action.

(b) Nothing contained in this Section shall prohibit any attorney general or other authorized state official from proceeding in state court on the basis of an alleged violation of any civil or criminal statute of such state.

§ 310.8  Fee for access to the National Do Not Call Registry.

(a) It is a violation of this Rule for any seller to initiate, or cause any

378

**Federal Trade Commission**                                                    **§ 310.8**

telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by §310.8(c), for access to telephone numbers within that area code that are included in the National Do Not Call Registry maintained by the Commission under §310.4(b)(1)(iii)(B); *provided,* however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§310.4(b)(1)(iii)(B)(*l*) or (*ii*), and the seller does not access the National Do Not Call Registry for any other purpose.

(b) It is a violation of this Rule for any telemarketer, on behalf of any seller, to initiate an outbound telephone call to any person whose telephone number is within a given area code unless that seller, either directly or through another person, first has paid the annual fee, required by §310.8(c), for access to the telephone numbers within that area code that are included in the National Do Not Call Registry; *provided,* however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§310.4(b)(1)(iii)(B)(*l*) or (*ii*), and the seller does not access the National Do Not Call Registry for any other purpose.

(c) The annual fee, which must be paid by any person prior to obtaining access to the National Do Not Call Registry, is $40 per area code of data accessed, up to a maximum of $11,000; *provided, however,* that there shall be no charge for the first five area codes of data accessed by any person, and *provided further,* that there shall be no charge to any person engaging in or causing others to engage in outbound telephone calls to consumers and who is accessing the National Do Not Call Registry without being required under this Rule, 47 CFR 64.1200, or any other federal law. Any person accessing the National Do Not Call Registry may not participate in any arrangement to share the cost of accessing the registry, including any arrangement with any telemarketer or service provider to

divide the costs to access the registry among various clients of that telemarketer or service provider.

(d) After a person, either directly or through another person, pays the fees set forth in §310.8(c), the person will be provided a unique account number which will allow that person to access the registry data for the selected area codes at any time for twelve months following the first day of the month in which the person paid the fee ("the annual period"). To obtain access to additional area codes of data during the first six months of the annual period, the person must first pay $40 for each additional area code of data not initially selected. To obtain access to additional area codes of data during the second six months of the annual period, the person must first pay $20 for each additional area code of data not initially selected. The payment of the additional fee will permit the person to access the additional area codes of data for the remainder of the annual period.

(e) Access to the National Do Not Call Registry is limited to telemarketers, sellers, others engaged in or causing others to engage in telephone calls to consumers, service providers acting on behalf of such persons, and any government agency that has law enforcement authority. Prior to accessing the National Do Not Call Registry, a person must provide the identifying information required by the operator of the registry to collect the fee, and must certify, under penalty of law, that the person is accessing the registry solely to comply with the provisions of this Rule or to otherwise prevent telephone calls to telephone numbers on the registry. If the person is accessing the registry on behalf of sellers, that person also must identify each of the sellers on whose behalf it is accessing the registry, must provide each seller's unique account number for access to the national registry, and must certify, under penalty of law, that the sellers will be using the information gathered from the registry solely to comply with the provisions of this Rule or otherwise to prevent telephone calls to telephone numbers on the registry.

[68 FR 45144, July 31, 2003, as amended at 69 FR 45585, July 30, 2004]

### § 310.9  Severability.

The provisions of this Rule are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions shall continue in effect.

## PART 311—TEST PROCEDURES AND LABELING STANDARDS FOR RECYCLED OIL

Sec.
311.1  Definitions.
311.2  Stayed or invalid parts.
311.3  Preemption.
311.4  Testing.
311.5  Labeling.
311.6  Prohibited acts.

AUTHORITY: 42 U.S.C. 6363(d).

SOURCE: 60 FR 55421, Oct. 31, 1995, unless otherwise noted.

### § 311.1  Definitions.

As used in this part:

(a) *Manufacturer* means any person who re-refines or otherwise processes used oil to remove physical or chemical impurities acquired through use or who blends such re-refined or otherwise processed used oil with new oil or additives.

(b) *New oil* means any synthetic oil or oil that has been refined from crude oil and which has not been used and may or may not contain additives. Such term does not include used oil or recycled oil.

(c) *Processed used* oil means re-refined or otherwise processed used oil or blend of oil, consisting of such re-refined or otherwise processed used oil and new oil or additives.

(d) *Recycled oil* means processed used oil that the manufacturer has determined, pursuant to section 311.4 of this part, is substantially equivalent to new oil for use as engine oil.

(e) *Used oil* means any synthetic oil or oil that has been refined from crude oil, which has been used and, as a result of such use, has been contaminated by physical or chemical impurities.

(f) *Re-refined oil* means used oil from which physical and chemical contaminants acquired through use have been removed.

### § 311.2  Stayed or invalid parts.

If any part of this rule is stayed or held invalid, the rest of it will remain in force.

### § 311.3  Preemption.

No law, regulation, or order of any State or political subdivision thereof may apply, or remain applicable, to any container of recycled oil, if such law, regulation, or order requires any container of recycled oil, which container bears a label in accordance with the terms of § 311.5 of this part, to bear any label with respect to the comparative characteristics of such recycled oil with new oil that is not identical to that permitted by § 311.5 of this part.

### § 311.4  Testing.

To determine the substantial equivalency of processed used oil with new oil for use as engine oil, manufacturers or their designees must use the test procedures that were reported to the Commission by the National Institute of Standards and Technology ("NIST") on July 27, 1995, entitled "Engine Oil Licensing and Certification System," American Petroleum Institute ("API") Publication 1509, Thirteenth Edition, January, 1995. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies of API Publication 1509, "Engine Oil Licensing and Certification System," may be obtained from the American Petroleum Institute, 1220 L Street, NW., Washington, DC 20005, or may be inspected at the Federal Trade Commission, Public Reference Room, room 130, 600 Pennsylvania Avenue, NW., Washington, DC, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.*

[60 FR 55421, Oct. 31, 1995, as amended at 69 FR 18803, Apr. 9, 2004]

### § 311.5  Labeling.

A manufacturer or other seller may represent, on a label on a container of

SYNOPSIS OF FEDERAL TRADE COMMISSION
DECISIONS CONCERNING UNORDERED MERCHANDISE          ATTACHMENT C

The Federal Trade Commission has determined that the
following acts or practices of sending and/or attempting to
collect payment for unordered merchandise are unfair and
deceptive and are unlawful under Section 5(a)(1) [15 U.S.C.
§45(a)(1)] of the Federal Trade Commission Act [15 U.S.C.
§§41-58]:

It is an unfair and deceptive act or practice to:

(1)  send any merchandise by any means without
     the prior expressed request or consent of
     the recipient unless such merchandise has
     attached to it a clear and conspicuous
     statement that the recipient may treat the
     merchandise as a gift and has the right
     to retain, use, discard, or dispose of it
     in any manner that the recipient sees fit
     without any obligation whatsoever to the
     sender; 1/

(2)  send any communication that in any manner
     seeks to obtain payment for or return of
     merchandise shipped without the prior
     expressed request or consent of the
     recipient. 2/

From the foregoing, it should be clear that it is
unlawful to send any bill or dunning communication for
unordered merchandise (i.e., merchandise sent without the
prior expressed request or consent of the recipient).  Under

1/  In the Matter of Sunshine Art Studios, Inc., et al.,
Docket 8825, Initial Decision December 20, 1971, 81
F.T.C. 836, 853, 857-59, 865-71, 880.  Affirmed by the
Commission at 882-84, 886-88, November 30, 1972.  Affirmed
by the United States Court of Appeals, First Circuit,
July 23, 1973, Sunshine Art Studios, Inc., et al. v. F.T.C.,
481 F.2d 1171, 1173-74.  Golden Fifty Pharmaceutical Co.,
et al., Docket 8792, 77 F.T.C. 277, 280-81, 289-90 (1970).
See also Section 3009 of the Postal Reorganization Act
(39 U.S.C. §3009, copy attached).

2/  Ibid.

Section 3009 of the Postal Reorganization Act, it is also
unlawful even to send unordered merchandise unless it
consists of:  (1) free samples clearly and conspicuously
marked as such, or (2) merchandise sent by a charitable
organization soliciting contributions.  In either case, the
merchandise must have attached to it a clear and conspicuous
statement that the recipient may treat the merchandise as a
gift and may retain, use, discard, or dispose of it in any
manner he or she sees fit without any obligation whatsoever
to the sender. 3/

        Section 3009 of the Postal Reorganization Act and the
Synopsis of the Commission's determinations cited above are
stated in terms which are intended to cover the many and
various methods and means which have been or might be employed
to send or bill for unordered merchandise.  To offer addi-
tional guidance, the following are brief synopses of merely
some of the more specific acts and practices which the
Commission has determined to be unlawful in connection with
the sending and billing for unordered merchandise.  The list
is not complete or all-inclusive but merely suggestive of
some related practices that also have been determined to
be unlawful.

        It is an unfair and deceptive act or practice to:

        (3)  pad or "kite" [e.g., increase, expand,
             inflate, or raise without prior expressed
             customer approval] orders or prices. 4/

_____

3/  See Postal Reorganization Act, 39 U.S.C. §3009.  Also,
the Commission has issued two enforcement policy statements
to advise the legal and business communities that it considers
Section 3009 to be a proper interpretation of Section 5 of the
Federal Trade Commission Act insofar as the sending or billing
for unordered merchandise are concerned -- whether it is sent
by U.S. mail or by nonmail shipment.  See 35 Federal Register
14328 (Sept. 11, 1970) and 43 Federal Register 4113 (Jan. 31,
1978).

4/  In the Matter of Star Office Supply Company, et al.,
Docket 8749, Initial Decision April 11, 1969, 77 F.T.C. 383,
402-03.  Affirmed by the Commission April 16, 1970, at 443-44,
446, 447, 455.

(4)   send merchandise which differs with respect to brand name, type, quantity, size, or quality from that represented in inducing orders or from that ordered by the purchaser; 5/

(5)   fail or refuse to accept bona fide cancellations or thwart and prevent cancellations of all or part of orders by customers who assert bona fide reasons therefor; 6/

(6)   represent, directly or indirectly, that a recipient of merchandise sent on "approval" (a) has a contract or agreement with the sender, or (b) must either pay for or return the merchandise:

    (i)   unless the recipient has expressly requested or consented to receive such merchandise on approval, or

    (ii)  if the recipient has specifically requested the sender not to ship the merchandise; 7/

---

5/  Ibid.  See also ibid at 419.

6/  Ibid. See also In the Matter of Sunshine Art Studios, Inc., et al., note 1 supra, 81 F.T.C. 836, 837, 857, 880, 882-84, 887, 888; In the Matter of Golden Fifty Pharmaceutical Co., et al., note 1 supra at 280-81, 289-90.

7/  In the Matter of Sunshine Art Studios, Inc., et al., note 1 supra, 81 F.T.C. 836, 837, 851-53, 856-59, 865-71, 880, 882-84.

(7) represent, directly or indirectly, that persons accepting a free offer will be under no obligation when, in fact, those accepting the free offer are (or are later informed that they are) obligated to (a) notify the sender to cancel further shipments, or (b) purchase or return additional shipments of merchandise; 8/

(8) represent, contrary to fact, that the shipper of unordered merchandise has a bona fide order for it. 9/

--------

8/  In the Matter of Golden Fifty Pharmaceutical Co., et al., note 1 supra at 288-90.  For additional guidance regarding use of the word "FREE" see the Commission's Guide Concerning Use of the Word "FREE" and Similar Representations at Title 16 of Code of Federal Regulations, Part 251.

9/  In the Matter of May Goldberg, Trading As Norman Company, et al., Docket 3812, Commission Decision, March 29, 1945, 40 F.T.C. 296, 300-01.

From the U.S. Code Online via GPO Access
[wais.access.gpo.gov]
[Laws in effect as of January 2, 2001]
[Document not affected by Public Laws enacted between
  January 2, 2001 and January 22, 2002]
[CITE: 39USC3009]

### TITLE 39--POSTAL SERVICE

### PART IV--MAIL MATTER

### CHAPTER 30--NONMAILABLE MATTER

Sec. 3009. Mailing of unordered merchandise

    (a) Except for (1) free samples clearly and conspicuously marked as
such, and (2) merchandise mailed by a charitable organization soliciting
contributions, the mailing of unordered merchandise or of communications
prohibited by subsection (c) of this section constitutes an unfair
method of competition and an unfair trade practice in violation of
section 45(a)(1) of title 15.
    (b) Any merchandise mailed in violation of subsection (a) of this
section, or within the exceptions contained therein, may be treated as a
gift by the recipient, who shall have the right to retain, use, discard,
or dispose of it in any manner he sees fit without any obligation
whatsoever to the sender. All such merchandise shall have attached to it
a clear and conspicuous statement informing the recipient that he may
treat the merchandise as a gift to him and has the right to retain, use,
discard, or dispose of it in any manner he sees fit without any
obligation whatsoever to the sender.
    (c) No mailer of any merchandise mailed in violation of subsection
(a) of this section, or within the exceptions contained therein, shall
mail to any recipient of such merchandise a bill for such merchandise or
any dunning communications.
    (d) For the purposes of this section, ``unordered merchandise''
means merchandise mailed without the prior expressed request or consent
of the recipient.

(Pub. L. 91-375, Aug. 12, 1970, 84 Stat. 749.)

## REASONS FOR SETTLEMENT

This statement accompanies the Consent Decree executed by defendants Scholastic, Inc., Grolier Incorporated, and Scholastic at Home, Inc., in settlement of an action brought to recover penalties and other equitable relief from defendants for engaging in acts or practices in violation of the Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, the Commission's Rule concerning the Use of Prenotification Negative Option Plans ("Negative Option Rule"), 16 C.F.R. § 425, the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, the Unordered Merchandise Statute, 39 U.S.C. § 3009, and prior Commission determinations relating to unordered merchandise.

Pursuant to Section 5(m)(3) of the Federal Trade Commission Act, as amended (15 U.S.C. § 45(m)(3)), the Commission hereby sets forth its reasons for settlement by entry of a Consent Decree and injunction:

On the basis of the allegations contained in the attached Complaint, the Commission believes that the payment of $710,000 in civil penalties by the defendants constitutes an appropriate amount upon which to base a settlement. The amount should assure compliance with the law by the defendants and by others who may be in violation of the FTC Act, the Negative Option Rule, the Telemarketing Sales Rule, the Unordered Merchandise Statute, and prior Commission determinations relating to unordered merchandise. Further, the defendants are permanently enjoined from engaging in acts or practices that are prohibited by these laws. With the entry of such Consent Decree the time and expense of litigation will be avoided.

For the foregoing reasons, the Commission believes that the settlement by entry of the attached Consent Decree with Scholastic, Inc., Grolier Incorporated, and Scholastic at Home, Inc., is justified and well within the public interest.